IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO



FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

06 JAN 13 PM 4: 32

CLERK-ALBUQUERQUE

STEVE HARVEY, ARLEN NORBY,
and DAVID GRIFFITH

      Plaintiffs,

vs.                                              No. CIV 04-401 WDS/RHS

CITY OF RIO RANCHO, a political
subdivision and
MICHAEL BAKER, in his individual capacity

      Defendants

## MEMORANDUM OPINION AND ORDER

This is a civil rights action in which the Plaintiffs, all of whom are police officers with the Rio Rancho Department of Public Safety, allege that Defendants retaliated against them for exercising their First Amendment right to free speech and association. Specifically, the Plaintiffs claim that they were vocal supporters and members of the police union, the Rio Rancho Department of Public Safety Association. ("DPSA") They claim the Defendants retaliated against them in different ways in response to their union membership and activism.

Because this is an employment retaliation case asserting a First Amendment right, the analysis of whether Plaintiffs have sufficiently alleged that Defendants violated their constitutional rights involves four steps. *Butler v. City of Prairie Vill.*, 172 F.3d 736, 745 (10th Cir. 1999); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968); *Connick v. Myers*, 461 U.S.

1

138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983). The first is to determine whether each plaintiff's speech[1] involved a matter of public concern. *Butler* at 745-46. The second is to "balance the interests of the employee in making the statement against the public employer's interests in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 746 (internal quotation marks omitted). Third, if the balance tips in favor of the plaintiff, then he must show that the protected speech was a motivating factor in the adverse employment decision that is complained of. *Id.* (internal quotation marks omitted). Finally, if the plaintiff makes this showing, "the burden then shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity." *Id.* (internal quotation marks omitted).

In their brief in opposition to the motion for summary judgment, Plaintiffs generally described their union activities and argued that those activities were a matter of public concern. The Court will address each of the Plaintiff's claims in turn.

## ARLEN NORBY

As an initial matter, Plaintiffs Norby and Griffith both claim that they engaged in protected speech by vocally supporting the DPSA's 2001 petition drive. The petition drive was run by the union and its intent was to increase staffing and pay levels in the Department of Public Safety. Both Plaintiffs and Defendants have devoted tremendous effort towards convincing the court that the 2001 petition drive was or was not, respectively, a matter of public interest. The Court acknowledges that

---

[1] The Court is aware of the split in the Circuits whether plaintiffs asserting First Amendment freedom of association claims must meet the "public concern" test developed in the free speech context. *Compare Griffin v. Thomas*, 929 F. 2d 1210, 1214 (7th Cir. 1991)(public concern test applies to association claims), *with Boddie v. City of Columbus*, 989 F.2d 745, 747 (5th Cir. 1993)(public concern test inapplicable to association claims). It was not necessary for the Court to address this issue in resolving this motion.

2

a threshold issue in a first amendment case is whether the relevant speech is of public, not private, interest. *See Tiltti v. Weise,* 155 F.3d 596, 602 (2d Cir. 1998) (lawsuit brought by plaintiff on behalf of other employees regarding pay under the FLSA is matter of "personal interest" and not "public concern"). While the petition drive, generally speaking, might have been in the public interest, Plaintiffs have not identified the particular speech by Norby that they claim is a matter of public interest. Even assuming that the subject matter of the petition drive touched on a matter of public concern, Plaintiff's evidence is insufficient to demonstrate protected speech *by Norby* under the First Amendment. "In order for a public employee's speech to be of public concern, . . . it is not always enough that its *subject matter* could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is *actually said* on the topic must itself be of public concern." *Koch v. City of Hutchinson,* 847 F.2d 1436, 1445 (10th Cir. 1988) (en banc) (internal quotation marks omitted; brackets in the original; second emphasis added). Here, Plaintiff's opposition brief contains no evidence of anything that he *actually said* while supporting the petition drive. Thus, he cannot rely on his participation in the petition drive to support his free speech claims.

However, even if Plaintiff had presented conclusive evidence of public interest speech by Norby during the petition drive, there is no evidence that he sustained an adverse employment action as a result of the speech. Norby tested for the position of Lieutenant in the Rio Rancho Department of Public Safety in September, 2001 and was placed in the sixth spot on the promotion eligibility list. The first four eligible employees were promoted to Lieutenant. Robert Maxon was fifth on the eligibility list, and would have been promoted to Lieutenant, but Maxon, a reservist, had been called up to active military duty in the Air Force shortly after September 11, 2001. Maxon was not promoted *in absentia,* but the fifth position was held open for Maxon during his overseas

3

deployment. When Maxon returned in September 2002 he was promoted to that position. Norby claims that he should have been promoted into the open Lieutenant position rather than having it held for Maxon. Norby does not question the testing and evaluation process itself, or his rank as sixth on the list of those eligible for promotion.

Defendants argue that the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. § 4301 *et seq.* required them to keep the position open so that it would be available for Maxon when he returned from military duty. Def. Brief p. 12. USERRA provides that "in the case of a person whose period of service in the uniformed services was for more than 90 days," the person must be "promptly reemployed . . . in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay." 38 U.S.C. § 4313(a)(2)(A). Maxon had given Defendants notice that he intended to assert his right of reemployment under USSERA.

While the Court does not agree with the Defendants that the USERRA requires the city to keep the position open, the Court does agree that the city would have had to place Maxon in a Lieutenant's position when he returned. It was reasonable for the city to keep the position open, given Maxon's notice that he would be asserting his reemployment rights under USERRA when released from active duty.

Nevertheless, Plaintiff has not offered a legal theory in opposition to the Defendants' position that they were barred by USSERA from promoting Norby in advance of Maxon. Rather, they rely on Defendant Norby's conclusory statement, apparently reflective merely of his personal belief, that he should have been promoted to Lieutenant since Maxon was overseas in the Air Force. Such a

conclusory statement is insufficient to avoid summary judgment. *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995). The failure to receive a promotion can only be considered an adverse employment action if the employee is legally entitled to the promotion.

Furthermore, it is uncontroverted that Norby was promoted to Lieutenant when the sixth position opened. The September 2001 promotion list, valid for twelve months, was extended for sixth months[2], and Norby was promoted to Lieutenant in March of 2003. In other words, Norby was sixth on the Lieutenant promotion list and was promoted into the sixth vacant Lieutenant's position as soon as that position became vacant. Norby did not sustain an adverse employment action. Accordingly, the complaint brought on behalf of Norby is dismissed with prejudice.

## GRIFFITH

Plaintiff David Griffith's claim of protected speech also arises primarily from the DPSA petition drive in early 2001. For reasons identical to that in the case of Norby, Griffith's claim that his support of the petition drive constituted protected speech fails. Plaintiff's brief contains no evidence of specific statements made by Griffith, just broad allegations that he spoke in favor of the drive. *Koch v. City of Hutchinson*, 847 F.2d 1436, 1445 (10th Cir. 1988). Such allegations are insufficient at the summary judgment stage of a case.

Griffith, however, has also failed to present evidence of the adverse employment action that he alleged. Griffith alleges that the promotion requirements for Captain were changed by Defendant Baker in order to allow a second applicant for the position. Specifically, Griffith alleges that Baker waived the requirement that applicants have attended the FBI National Academy or Northwestern

---

[2]There is some question whether Baker advocated that the promotion list not be extended for sixth months. Whether Baker did so or not, and for what motive, is not relevant in view of the fact that the list was extended, and Norby was promoted.

5

School of Police Staff and Command. Griffith alleges that Baker's decision to lower the educational requirements for Captains was in retaliation for: (1) Griffith's participation in the petition drive; and (2) Griffith's 2003 criticism of Baker for "union busting" and destabilizing the DPSA leadership.

As noted earlier, the general allegation that Griffith "supported" the 2001 petition drive is insufficient to defeat summary judgment. Secondly, the petition drive was more than two years before Griffith started the promotional process for Captain. In this case not only is the elapsed time important, but even more important is that Griffith was promoted to Lieutenant in 2001, immediately after his participation in the petition drive. Furthermore, while Griffith criticized Baker in 2003, the educational requirements were changed some time before November, 2001[3]. It is axiomatic that Griffith's 2003 criticism of Baker could not have caused Baker's 2001 decision to change the promotional requirements for Captain.

Plaintiffs must demonstrate a causal relationship between protected activity and an adverse employment action. The Tenth Circuit has held that protected conduct closely followed by adverse action may justify an inference of retaliatory motive. *Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005). Or, Plaintiffs can show that a pattern of retaliatory conduct began shortly after protected speech, even if the final adverse action did not occur until much later. *Conner v. Schmuck Markets, Inc.*, 121 F. 3d 1390, 1395 (10th Cir. 1997).

In this instance, Griffith has not presented facts sufficient to raise a question whether he engaged in protected speech during the 2001 petition drive. Nor has Griffith presented evidence as

---

[3] The promotion SOP was revised effective November 2001. Baker's decision to revise the SOP would have had to have been made some time before the effective date.

to the date Baker decided to eliminate certain educational requirements for the position of Captain[4]. This date is significant, as the decision would have had to have been made after Griffith's speech in support of the petition drive in order to be seen as retaliatory. Additionally, Griffith was promoted to Lieutenant in 2001, so there is no evidence of a pattern of retaliatory conduct starting shortly after the conclusion of the petition drive. Furthermore, when Baker changed the promotion requirements for Captain in 2001, Griffith was not even a Lieutenant, and there is not a scintilla of evidence suggesting that the educational requirements were changed in anticipation of Griffith's testing for Captain in 2003. Griffith did not sustain an adverse employment action. Accordingly, the complaint brought on behalf of Griffith is dismissed with prejudice.

## STEVEN HARVEY

Plaintiff Steven Harvey alleges two instances of retaliation by Defendants. The first involves his demotion from Lieutenant to Detective in 2001, and the second arises from his involvement with the New Mexico Gang Task Force (NMGTF). Harvey was promoted from Detective to Lieutenant in 2000 by Defendant Baker's predecessor, Dencil Haycox. Harvey's promotion was a "spot" promotion, meaning that there was no posting of the position and no testing process or other competition for the position. Haycox had made several other spot or temporary promotions during his tenure as director of the DPS. Harvey had not served in the position of Sergeant, which is the rank between Detective and Lieutenant. Harvey was spot promoted past the eleven Sergeants in the Department of Public Safety at that time who were eligible for promotion to Lieutenant. The DPSA,

---

[4]To the contrary, Plaintiff clearly implies that the educational requirements for Captain were changed after the Captain's position was posted, allegedly because Baker realized at that time that Griffith was the only qualified candidate for the position. This implication is rebutted by the facts of the case.

itself, formally protested the promotion of Harvey, noting the above facts and stating "the members of DPSA, in general, do not feel that it is in the best interest of the Department or morale for the promotion of Steve Harvey to stand."

Defendant Baker replaced Dencil Haycox as the Director in 2001. In July of 2001 Baker rescinded all of the temporary and spot promotions that had been made by Haycox, including Harvey. Baker worked with the DPSA to revise the procedures and standards for promotion[5]. In August of 2001 the DPS posted the Lieutenant positions that had been left open when Baker rescinded Haycox' temporary and spot promotions. Plaintiff Griffith tested for Lieutenant, was ranked fourth overall, and was promoted to Lieutenant in December 2001. Plaintiff Norby tested for Lieutenant, was ranked sixth overall, and was promoted to Lieutenant in March 2003. Harvey did not test for Lieutenant because he did not meet the prerequisites. Specifically, he had never served as a Sergeant, while the position of Lieutenant required two years experience as a sergeant within the Rio Rancho DPS. No other Detective in the DPS was eligible to test for Lieutenant. Harvey claims that the revocation of his spot promotion reflected anti-union animus on the part of Baker, and he further claims that he was "not allowed" to test for Lieutenant in August 2001, also as a result of Baker's anti-union animus.

Unlike Griffith and Norby, Harvey did not participate in the petition drive in the spring of 2001. Harvey bases his first amendment action on speech during union negotiations in 1998. Harvey claims he negotiated with Baker, and questioned Baker's integrity during the course of the negotiations. Even assuming that the negotiation of a collective bargaining agreement could be seen

---

[5]These revisions included the reduction in time of service for promotion from Lieutenant to Captain, discussed in the section relating to Plaintiff Griffith.

as "public" speech, which is far from clear, the 1998 negotiations are far too remote in time to be causally linked to Harvey's 2001 demotion. *See Baca v. Sklar*, 398 F.3d 1210, 1221 (10th Cir. 2005). Nor has Harvey shown a pattern of retaliatory conduct that began shortly after the 1998 negotiations and continued until the 2001 demotion. *See Conner v. Schmuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

Nor has Harvey presented any evidence that the demotion was caused by Baker's anti-union animus. To the contrary, in this instance there is unequivocal evidence that it was Harvey's own union that first objected to his spot promotion. The union specifically objected to Harvey's spot promotion, declaring that it was not in the "best interest of the Department or morale for the promotion of Steve Harvey to stand." The evidence shows that when Baker replaced Haycox as director of the Department of Public Safety, he responded to the union's concerns, revoked all temporary and spot promotions, worked with the union to revise the promotion SOPs, and administered the Lieutenant promotion process in accordance with the revised promotion SOP. Harvey's suggestion that his demotion was an example of Baker's anti-union animus has no factual underpinnings, whatsoever.

Nor is there merit to Harvey's claim that he was "not allowed" to test for promotion to Lieutenant in August 2001. Harvey has not presented any evidence that he met the qualifications for Lieutenant, or that he even asked to test for the position, whether or not he was qualified to do so. It is not an adverse employment action when an employee fails to receive a promotion for which he was not qualified or for which he did not apply.

The other part of Harvey's claim relates to his involvement with the New Mexico Gang Task Force ("NMGTF"). For a number of years before 2002, Rio Rancho was the fiscal agent for the

9

NMGTF under a grant agreement with the New Mexico Department of Public Safety. For part of that time Harvey received a salary as a full-time officer of the Rio Rancho Department of Public Safety plus a stipend for being the NMGTF Coordinator. Rio Rancho terminated the fiscal agent relationship effective July 1, 2002. Harvey negotiated an arrangement with the NMGTF where they paid his salary as the task force coordinator. At the same time, Harvey entered into an employment contract with the City of Rio Rancho which provided that he become a term employee of the city, working under the supervision of the Director of the NMGTF. The contract provided that Harvey would not be a member of the DPSA bargaining unit while he was working for the NMGTF. The contract also set forth the terms under which Harvey could return to full time employment with the Rio Rancho DPS.

Harvey claims that Rio Rancho's decision to terminate its status as fiscal agent for the NMGTF, its decision to require him to sign an employment contract, and the contract's purported exclusion of him from the DPSA bargaining unit all constitute retaliation against him for his union activity. Harvey's position is not well taken. Initially, Harvey can point to no "public speech" preceding Rio Rancho's decision regarding the gang task force other than the aforementioned 1998 dispute during negotiation of the collective bargaining agreement. Harvey identified no direct evidence that the decision to terminate the fiscal relationship between Rio Rancho and the NMGTF was made with an intent to punish him. Harvey has not offered direct or indirect evidence of retaliation, such as that other police officers were allowed to work full-time for outside agencies without an employment contract, or were allowed to remain members of the DPSA bargaining unit while employed full-time by outside agencies. Furthermore, Harvey's decision to work full time for the NMGTF while retaining a right to return to full-time employment with the Rio Rancho

Department of Public Safety was a purely voluntary decision on his part, not an "adverse action" imposed upon him by Director Baker.

In Paragraphs 43 through 45 of Plaintiff's Counterstatement of Material Facts, Harvey notes that the employment agreement had a provision purporting to bar Harvey from belonging to the DPSA, and he alleges that Baker's intent was to deny Harvey union membership, seniority, pay and benefits. Harvey also alleges that Baker intended to "create a dispute between Harvey and the DPSA over seniority." First, the Court notes that, other than citing to Baker's deposition generally, Plaintiff has not provided citation to the record to support these allegations. However, the Court has reviewed what appear to be the relevant portions of Baker's deposition and supporting documents. Plaintiff's allegations do not withstand scrutiny. At the most basic level, Harvey has made no showing that he was legally entitled to maintain his membership in the DPSA while he worked full time for the NMGTF as a term employee of the city. Harvey has made no showing that any "term employee" of the City of Rio Rancho would have been eligible for membership in the DPSA. The fact that Harvey would have liked to work as a term employee while maintaining his union privileges is of no legal consequence.

Furthermore, Plaintiff's suggestion that Baker wanted to create a dispute between Harvey and the DPSA simply misrepresents the evidence. Exhibit 6 to Baker's deposition includes an April 12, 2002 email exchange between Baker and Robert Force, a city employee involved in drafting the employment contract, that discussed the terms of Harvey's employment contract vis-a-vis the DPSA collective bargaining agreement, specifically, whether or how his status as a term employee would affect his accumulation of seniority for union purposes. Force expressed his opinion that Harvey would not accumulate seniority during the time he worked for the NMGTF. Force then noted that

11

the DPSA could take the far more severe position that Harvey would lose all his seniority as a contract employee, rather than just not accumulating additional seniority. Baker responded by instructing Force to delete the section of the draft employment agreement relating to accumulation of seniority: "I say leave section 2(d) out and let him fight DPSA over the seniority issue." Far from being evidence that Baker "wanted to create a dispute between Harvey and the DPSA over seniority," Baker's statement made it clear that he wanted to avoid a possible conflict by omitting any reference to the seniority issue in Harvey's employment contract.

Harvey also alleges that he was subjected to anti-union animus during the course of his full-time employment with the NMGTF. He claims that Baker tried to interfere with his becoming President of the Rio Rancho DPSA in 2003. He claims that Baker forwarded certain documents to the NMGTF[6], and he claims that Baker refused to renew his employment contract because he had become the union president. Again, Harvey has not presented facts to support his allegations of retaliation resulting from anti-union animus. There is evidence that Baker questioned whether Harvey could be elected president of the union while he was not a member of the bargaining unit. There is no evidence that Baker attempted to have Harvey removed from the position of president, and Harvey completed his term as president. Whatever Baker's intention was with regard to renewing Harvey's contract with the NMGTF, that issue became moot when Harvey elected to return to full time employment with the DPSA. Specifically, Harvey testified that he invoked his contractual right to return to the DPSA

---

[6]Harvey claims that Baker sent the documents anonymously, but offers no proof that that was the case. For purposes of this opinion, it makes no difference whether Baker voluntarily and anonymously sent the documentation, or sent the documentation at the request of the NMGTF, as Baker testified.

> "...after meeting with Mike Baker and being advised that there was no longer going to be any open staffing positions. I think when we met, he said actually that we would be full staff within two weeks, and that's basically what urged this prompting is that, in keeping with the wording in the contract, that I could only go back if there was, in fact, an open position." (Deposition of Steven Harvey, p. 269)

Accordingly, whether or not Harvey's employment contract would have been renewed later in the summer of 2003, Harvey made the decision to return to full-time employment with the DPS as of July 1, 2003, rather than continue with the NMGTF and risk losing his position in Rio Rancho.

Upon his return to full time employment with the DPS, Harvey continued secondary employment with the NMGTF. The DPS Standard Operating Procedure for Secondary Employment prohibits the "use of any Department equipment or records for the purposes of off-duty employment." DPS SOP on Secondary Employment, Sec. C(6), attached to Defendant's motion as Exhibit G. Harvey sought an exception to the policy prohibiting use of DPS equipment for secondary employment, and that exception was denied. Harvey contends this denial was additional retaliation against him. Again, however, Harvey has produced no evidence to support his contention. There is no evidence that other management-friendly DPS personnel had been granted an exception such as that sought by Harvey. In fact, there is no evidence that an exception to the SOP prohibiting use of DPS equipment in secondary employment had ever been granted. In the absence of such evidence, there is no basis to conclude either that the denial was an adverse employment action, or that anti-union animus was a "motivating factor" in the denial.

Harvey grieved and then demanded arbitration of the refusal to allow him to use DPS property for his secondary employment and sought a preliminary injunction in state court when the demand for arbitration was denied. Harvey's application for preliminary injunction was dismissed by the state court on December 10, 2003. Harvey alleges that Baker retaliated against him for filing the petition

13

for injunction by sending the pleadings and articles related to the injunction to the Executive Director of the NMGTF. However, it is undisputed that no adverse employment action was taken by the NMGTF in response to its receipt of the documents in question.

Finally, Harvey received a letter of warning on November 14, 2003 for failure to meet with Sgt. Tanya Smith concerning an internal inquiry. Harvey canceled an interview appointment with Sgt. Smith and then did not respond to pages and cellular telephone messages left by her during his regular working hours. It is far from clear whether Plaintiffs have pursued this issue in their opposition brief. However, the reprimand was issued by Harvey's supervisor and co-Plaintiff, Arlen Norby. See Exhibits W and Y to Harvey Deposition. The letter was intended to be left in his file for six months, and it was removed on May 14, 2004. Harvey has presented no evidence that the reprimand resulted from anti-union animus. And, although letters of reprimand can be construed as adverse employment action, in this instance the letter was kept in Harvey's file only for the stipulated six months, and Harvey sustained no detrimental impact, for example, an inability to apply for promotion, as a result of the presence of the letter in his file for six months. The Court does not consider the letter of warning to be an adverse employment action, nor does it consider the letter of warning to be evidence of anti-union animus. Accordingly, the complaint brought on behalf of Steven Harvey is dismissed with prejudice.

IT IS THEREFORE ORDERED that Summary Judgment shall be granted as to all of Plaintiffs' claims against the City of Rio Rancho and Michael Baker.

**W. Daniel Schneider**
**United States Magistrate Judge**

14